J-A19037-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| DAMIAN SCHULTZ | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KRYSTAL SCHULTZ | : | No. 108 WDA 2025 |

Appeal from the Order Entered December 30, 2024
In the Court of Common Pleas of Butler County Civil Division at No(s):
F.C. No. 22-90166-C

BEFORE:  BOWES, J., STABILE, J., and BENDER, P.J.E.

MEMORANDUM BY BOWES, J.:                **FILED: OCTOBER 20, 2025**

Damian Schultz ("Father") appeals from the custody order awarding Krystal Schultz ("Mother") primary physical custody of their son, C.S., born in September 2018, and permitting relocation of C.S. to Altoona with Mother. We affirm.

Mother and Father married in 2003, residing in Valencia, Pennsylvania. Approximately one year after C.S. was born, Mother began an internship in Erie in pursuit of her doctorate in psychology.  In January 2020, Mother resided in Erie part-time.  Around the same period that Mother started her internship, Father rekindled his relationship with his high school girlfriend, Karen Colonello.  The affair continued while Mother traveled approximately two hours between Erie and Valencia for the internship and then a two-year residency.  Throughout that period, C.S. occasionally traveled to Erie with Mother but generally stayed in Valencia with Father.  Ms. Colonello regularly

provided childcare for C.S. when Father was at work, unbeknownst to Mother. In January 2022, Mother resumed primary care for C.S. after Father dropped him while inebriated. The following month, Mother learned about the affair from C.S. By March, Mother and Father separated, Mother returned to the marital home with C.S. and took over full custody, and Father commenced the instant proceedings to regain custody.

As explained by the trial court:

The lengthy custody litigation began in March 2022, when Father filed a complaint for custody and divorce complaint against Mother. The parties appeared before the custody conciliator in late April 2022 and, upon the conciliator's recommendation, the court ordered [that] Mother receive primary physical custody of [C.S.], subject to Father's periods of partial physical custody three weekends per month from Friday morning until Sunday afternoon. Father was also directed to enroll in the alcohol monitoring device, Soberlink. A conciliation review conference was scheduled on August 2, 2022.

. . . At motion court on May 31, 2022, the court denied Father's motion to appoint a custody evaluator. Father subsequently requested a pretrial conference before the court on August 8, 2022, later rescheduled to August 30, 2022.

Father also filed a petition for contempt and sanctions against Mother. The court entered an order finding Mother was not in contempt and denying Father's counsel fees request. This order further directed Father to immediately enable Mother access to Father's Soberlink test results and that Father receive a makeup weekend in July 2022.

On July 19, 2022, Father presented a motion for reconsideration of the June 3, 2022, order of court denying the appointment of a custody evaluator. The court issued an order erroneously dated July 18, 2022[,] denying reconsideration stating that, if the custody conciliator believed custody evaluations

were warranted, then she could recommend it at the review conferences scheduled in August 2022.

On August 19, 2022, Mother filed a notice of proposed relocation from Butler County to Altoona, Blair County, Pennsylvania. Mother and Father filed pretrial statements on August 23, 2022. Father's counter-affidavit opposing Mother's request to relocate with the parties' child was docketed on August 26, 2022.

The conciliator's report issued August 23, 2022[,] and adopted by an order, recommended custody evaluations be undertaken by Dr. Eric Bernstein and, significantly, that the parties begin equally sharing physical custody of their young son on an alternating week-to-week basis with exchanges to occur on Sundays at 6:00 p.m. In addition, Father could discontinue with Soberlink alcohol monitoring. Legal custody remained shared.

Custody Opinion, 12/30/24, at 1-3 (some capitalization altered, parenthetical numbering omitted).

While the relocation petition remained undecided, Mother moved to Altoona and, "[t]hrough their respective counsel, the parties reached an interim custody arrangement, pending further proceedings." Order of Court, 9/7/22. The order memorialized the parents' agreement to 50/50 custody "on an alternating week-to-week basis." *Id*. Additionally, the court consolidated Mother's relocation request and Father's complaint for sole legal and primary physical custody for trial.

Dr. Bernstein conducted custody evaluations of Mother, Father, and Ms. Colonello. The court granted Father's uncontested request to have Dr. Bruce Chambers critique Dr. Bernstein's custody evaluation and recommendation. The court conducted the consolidated trial over six days: June 7, 2023; June 8, 2023; August 25, 2023; November 8, 2023; March 11, 2024; and May 22,

2024.[1]   Over the first three days of trial, the court heard testimony from Dr. Bernstein, Father, Mother, and Dr. Chambers.  Each parent sought primary physical custody and proposed that the non-custodial parent be granted three weekends per month.  In the summer, both parents supported a two-week on, two-week off, rotation.  ***See*** N.T. Hearing, 6/7/23, at 246-48; N.T. Hearing, 8/25/23, at 102-03.  Much of their testimony focused on lambasting the other for purported improprieties during the marriage and after its dissolution.

Dr. Bernstein testified that the interactions between Mother and C.S., and between Father and C.S., were positive.  He noted concerns with Ms. Colonello because she appeared unengaged during the interactional evaluation with C.S. and Father, thereby demonstrating a "lack of effort to join the family in any meaningful play or interaction."  N.T. Hearing, 6/7/23, at 64.  He also observed that Mother made a negative comment about Father at the beginning of the interactional, but that C.S. was listening to his headphones at the time.  Dr. Bernstein opined that, based upon his interviews, Mother was not attempting to alienate Father, but "that when provoked by an issue, she may not have the filter that is ideal."  ***Id***. at 85.

---

[1] The court granted Father's uncontested motion to continue the start of trial until June 7, 2023.  At the court's direction, Father submitted an affidavit waiving compliance with the timing requirements set forth in Pa.R.Civ.P. 1915.4(c) ("Trials before a judge shall commence within 90 days of the date the scheduling order is entered.  Trials and hearings shall be scheduled to be heard on consecutive days whenever possible but, if not on consecutive days, then the trial or hearing shall be concluded not later than 45 days from commencement.").

Based upon the observations and interviews, Dr. Bernstein recommended both parents to attend counseling to reduce the "venom between these parties[,]" which he believed "would be more effective in helping the child long term, preventing him from being exposed to whatever it is that is encircling him from day to day." *Id*. at 85. As far as a custody recommendation, Dr. Bernstein determined that equal physical custody would be "considerably disruptive and intrusive[,]" and "maybe even impossible" in light of the distance between the parties and the antipathy between Mother and Father, but instead of recommending who should have primary custody, he "bounced the ball to the [c]ourt." *Id*. at 65-66. He explained that he "did not have enough information to endorse either for primary. . . . because of . . . the challenge with the distance between the homes and what [he] viewed at the time as pretty significant obstacles concerning each party's unresolved resentments that seem to be intrusive into their case." N.T. Hearing, 8/25/23, at 54.

Dr. Chambers offered critiques of this assessment, particularly Dr. Bernstein's failure to provide an opinion as to who should obtain primary custody and his negative statements about Ms. Colonello. At the conclusion of three days of testimony, the court ordered the parties to enroll in Our Family Wizard for future co-parenting communications.

On November 8, 2023, the fourth day of trial, the court interviewed then-five-year-old C.S. *in camera*. Also on that date, Mother finished her testimony, and the court heard from Emil Schultz, Jr., paternal grandfather;

Teresa Fomori, paternal aunt; Chastity Beers, the director of the nursery school where Mother enrolled C.S. in November of 2022; Angela Kushner, the director of the nursery school where Father enrolled C.S. in September of 2023;[2] and Keith Glackin, vice president of Father's family business.

At the end of court that day, the court emphasized the importance of C.S. attending a single preschool for consistency and acclimation before kindergarten. Therefore, it granted relocation to Altoona and awarded Mother primary physical custody starting in January. Father would receive three weekends per month during the school year. In the summer, the court granted Father two weeks in a row followed by one for Mother, to make up for the lost school-year-time, so that Father and Mother alternated on a two-one-two-one basis. *See* N.T. Hearing, 11/8/23, at 191-95.

Father filed a motion for reconsideration, claiming that he had not closed his case-in-chief before the court entered its decision. The court kept its interim November order in place, reducing it to writing in January, but reopened the record in a limited manner to permit Father to call Ms. Colonello as a witness, and for Mother and Father to take the stand again, if necessary, to rebut her testimony. *See* N.T. Hearing, 12/20/23, at 7-8. As set forth by the trial court:

> The parties consented by motion to continue resumption of the trial testimony from February 1, 2024. The court rescheduled [the next day] of the trial to March 11, 2024. Testimony [from

---

[2] It was later learned that C.S. stopped attending that school after the November 2023 hearing.

Ms. Colonello] was received on that date. However, counsel for both parties requested more time to present rebuttal testimony. An additional one-half day for limited rebuttal testimony was held on May 22, 2024.

[In the interim,] Mother presented a motion for contempt and special relief against Father on April 9, 2024. He filed a response. The court entered an order the same day directing [that] Mother's motion for contempt and special relief be consolidated with the resumption of limited rebuttal testimony [to Ms. Colonello's testimony] on May 22, 2024. . . .

At the proceeding held May 22, 2024, the court found Father in civil contempt by willfully disregarding the shared legal custody provisions under the order of court dated January 4, 2024, by having [C.S.] baptized without Mother's equal input, knowledge, and consent.

Custody Opinion, 12/30/24, at 4-5 (some capitalization altered, parenthetical numbers omitted). During the May hearing, both parents were permitted to testify in rebuttal. However, as will be discussed in more detail below, the court limited Father's testimony insofar as he sought to rebut Mother's testimony and challenge her credibility.

The court then took the custody and relocation matters under advisement. Approximately seven months later, with no opinion having been issued in violation of Pa.R.Civ.P. 1915.4(d),[3] Father moved for the court to

_____

[3] Specifically, this portion of the rule provides:

**(d) Prompt Decisions.** The judge's decision shall be entered and filed within 15 days of the date upon which the trial is concluded unless, within that time, the court extends the date for such decision by order entered of record showing good cause for the extension. In no event shall an extension delay the entry of the court's decision more than 45 days after the conclusion of trial.

Pa.R.Civ.P. 1915.4.

enter a final order. Three days later, the court issued a detailed opinion, wherein it determined that it was in C.S.'s best interests to: (1) relocate to Altoona with Mother; (2) award Mother primary physical custody during the school year, with Father exercising custody three weekends each month; and (3) rotate custody in the summer on a two-one-two-one schedule, wherein C.S. would alternate between two consecutive weeks with Father and one with Mother.

This appeal followed.[4] Father included a concise statement within his notice of appeal, and the trial court authored a responsive Pa.R.A.P. 1925(a) opinion. In this Court, Father raises a bevy of issues:

1. Whether the trial court erred and abused its discretion by granting Mother's relocation and primary custody request by:

A. Pre-judging Mother's relocation request and granting the same at the beginning of trial over Father's objection.

---

[4] Father indicated that he was appealing from the January 4, 2024 interim order, in addition to the final custody order entered on December 30, 2024. The appeal properly lies from the final custody order, though the interim order is reviewable so long as the issues raised regarding it were not rendered moot by the entry of the December order. *See G.B. v. M.M.B.*, 670 A.2d 714, 717 (Pa.Super. 1996) (*en banc*) (noting that "[f]ew legal principles are as well settled as that an appeal properly lies only from a final order unless otherwise permitted by rule or statute" (cleaned up)). Presently, because the interim order modified the status quo, we will consider the merits of Father's issues pertaining to that order. *See E.B. v. D.B.*, 209 A.3d 451, 462 (Pa.Super. 2019) ("Although the trial court entered the interim order on an interim basis, that interim basis lasted for almost ten months during discovery and pre-trial proceedings, and ultimately impacted the status quo the trial court had to consider at the custody trial. Therefore, because of the importance of ensuring that trial courts follow correct procedures when entering interlocutory custody orders that have significant impact on the final custody decision, we will proceed to the merits." (cleaned up)).

B. Entering an unappealable written interim order on January 5, 2024 granting relocation and ending Father's 50/50 custody rights prior to the close of his case in chief without any emergency to support the same in violation of Father's due process rights.

C. Disregarding the trial court's own expert witness, who testified that it was error for the trial court to prejudge and to grant Mother's relocation and that the relocation should ultimately be denied with the parties exercising 50/50 physical custody.

D. Failing to consider Mother's stated motivation for relocating to Altoona and refusal to find similar available employment in Butler.

E. Failing to enter a timely final appealable order within the strict time limits as set forth in Pa.R.Civ.P. 1915.4.

F. Denying Father's request to present limited rebuttal testimony directly related to the relocation factors the court is mandated by statute to consider pursuant to 23 Pa.C.S. § 5337(h) and the best interests standard pursuant to 23 PA.C.S. § 5328(a).

G. Failing to find that Father was the primary custodial parent for the majority of the child's life, prior to separation and further erred in refusing Father's request to present limited rebuttal evidence establishing the same.

H. Granting Mother primary physical custody when . . . Mother, Father, and the trial court's expert witness all testified that the child is thriving in a 50/50 physical custody arrangement.

I. Failing to consider the full extent that Mother's mental health struggles affect the child and co-parenting.

J. Failing to consider the child's best interests as the primary concern.

2. Whether the trial court erred and abused its discretion in finding that . . . Mother has reasonable alcohol concerns of Father.

- 9 -

3.   Whether the trial court erred and abused its discretion in a negative finding toward Father regarding care for the child and nursery school enrollment.

4.   Whether the trial court erred and abused its discretion in finding that . . . Father's home had higher instability than . . . Mother's home.

5.   Whether the trial court erred and abused its discretion in failing to address the multiple instances of parental alienation efforts by Mother against Father and to consider the same in its relocation analysis.

6.   Whether the trial court erred and abused its discretion in finding that Father admitted to installing a GPS gadget on one of his company vehicles Mother drove to track her every move, which was completely contrary to Father's testimony and the evidence.

7.   Whether the trial court erred and abused its discretion by not providing . . . Father additional time during the holidays or on months with a fifth weekend when the trial court took substantial custody time away from Father in order to grant the relocation.

Father's brief at 54-56 (some capitalization and citations altered).

We begin with the principles generally governing our consideration of these issues:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion.  We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations.  In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings.  Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record.  We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***White v. Malecki***, 296 A.3d 1210, 1213 (Pa.Super. 2023) (cleaned up).

The General Assembly has set forth specific factors a court must weigh before determining custody and relocation requests.  Regarding custody, the court was required to abide by the following version of 23 Pa.C.S. § 5328(a), which was in effect at the time of the custody trial:[5]

_____

[5] We note that § 5328(a) has since been twice amended.  First, the legislature amended it while the trial court held the matter under advisement:

> Section 5328(a), along with other domestic relations provisions, was amended pursuant to Act of April 15, 2024, P.L. 24, No. 8 (known as "Kayden's Law"), effective August 13, 2024.  Kayden's Law expands the factors to be considered in the custody court's best interest analysis and now requires the court to give "substantial weighted consideration" to, *inter alia*, the "safety of the child," which is defined in Kayden's Law as including "the physical, emotional and psychological well-being of the child," and any "[v]iolent or assaultive behavior committed by a party."  Act of April 15, 2024, P.L. 24, No. 8, §§ 2-3 (as amended 23 Pa.C.S. §§ 5322(a), 5328(a)).

***Velasquez v. Miranda***, 321 A.3d 876, 886 n.6 (Pa. 2024); ***see also Bonilla v. Bonilla***, 333 A.3d 27, 2024 WL 5039619, at *1 n.2 (Pa.Super. 2024) (non-precedential decision) ("In addition to new elements, our review of these amendments also reveals that the language of many of the factors have been substantively revised." (cleaned up)).

Then, while the matter remained pending in this Court, it was amended again.  This newest version largely consolidated and reorganized several of the custody factors.  ***See*** 23 Pa.C.S. § 5328 (effective August 29, 2025).

It is well-settled that "[n]o statute shall be construed to be retroactive unless clearly and manifestly so intended by the General Assembly." 1 Pa.C.S. § 1926.  Since the amendments to § 5328 contained no such retroactivity clauses and the proceedings concluded before the changes took legal effect, we do not apply either revised version.  ***See Hess v. Zapata***, 339 A.3d 391, 2025 WL 1078891, at 4 n.5 (Pa.Super. 2025) (non-precedential decision)
*(Footnote Continued Next Page)*

**(a) Factors.--**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

_____

(applying pre-Kayden's Law version of § 5328 because, although the court rendered its decision after its effective date, the hearings were held before it took effect).

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328 (effective January 1, 2014 to August 12, 2024).

As to relocation, the court was obligated to consider § 5337, which provides:

**(h) Relocation factors.--**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337.

Most of Father's issues challenge the court's analyses of these sets of factors and the weight it assigned various factors in determining what was in the best interests of C.S. as to relocation and custody. *See* Father's brief at 74-76 (attacking the court's disregard of Dr. Bernstein's opinion in permitting

relocation before the close of Father's case and in ultimately granting relocation); *id*. at 77-78 (averring that the court failed to consider Mother's motive to relocate based on not wanting to return to the marital home); *id*. at 90-92 (complaining that the court improperly found Mother to have primary custody prior to Father's filing of the underlying action); *id*. at 94-97 (arguing that the court erred in granting Mother primary physical custody where the evidence demonstrated that C.S. was thriving on a 50/50 schedule); *id*. at 97-101 (alleging the court failed to consider "the full extent" of Mother's mental health struggles); *id*. at 101-08 (claiming the court neglected to evaluate the factors in the best interests of C.S., and instead focused on Mother's feelings); *id*. at 111-13 (challenging the court's finding that Mother had reasonable alcohol concerns about Father); *id*. at 115-16 (proffering that the court abused its discretion in making a negative finding as to Father's childcare and preschool arrangement versus Mother's nursery school and preschool); *id*. at 118-19 (claiming the court erred in finding Father's home more unstable than Mother's in light of their respective upbringings and family life); *id*. at 120-24 (arguing the court erroneously disregarded Mother's alienation attempts); *id*. at 125 (challenging the court's finding that Father placed a tracking device on Mother's vehicle for purposes of surveilling her movements).

The trial court delineated its assessment of each custody and relocation factor in its forty-three page opinion announcing its decision.[6] ***See*** Custody Opinion, 12/30/24, at 11-33 (custody factors), 33-37 (relocation factors). To summarize, it credited Mother's concerns that Father drove under the influence of alcohol with C.S., and did not secure the firearm he kept in his vehicle. ***Id***. at 11. Therefore, it determined that Mother was more likely to ensure the safety of C.S. ***Id***. The court also concluded that Mother was more likely to facilitate contact between C.S. and the non-custodial parent. ***Id***. at 12-14. Since Father primarily relied upon his girlfriend to perform parental duties when C.S. was in his care, the court found the parental duties factor "weigh[ed] heavily in Mother's favor." ***Id***. at 16. It assessed favorably Mother's enrollment of C.S. in full-time preschool and pre-kindergarten while she was at work because it allowed him to socialize and build relationships with other children, as opposed to his staying at home with Father's girlfriend or sister, or going to Father's worksites with other adults. ***Id***. at 22. Moreover, Mother arranged playdates, whereas Father did not. ***Id***. The court

---

[6] We note that the court herein improperly utilized Kayden's Law in rendering its decision. No party has complained about this misapplication and we will not raise this error *sua sponte*. However, we note that notwithstanding the notable changes that took place in Kayden's Law, the custody court was always permitted to consider those newly-delineated safety concerns under one of the other factors or the § 5328(a)(16) catch-all. ***Cf.*** 23 Pa.C.S. § 5328 (effective January 1, 2014 to August 12, 2024) ***with*** Kayden's Law, 23 Pa.C.S. § 5328 (effective August 13, 2024 to August 28, 2025); ***see also Velasquez***, 321 A.3d at 886 n.6 ("The[ Kayden's Law] changes do not undermine the court's custody determination based on other applicable [§] 5328(a) factors."). Therefore, even if we were to address this misstep, we likely would not find reversible error.

likewise found that the factor regarding attending to daily needs slightly favored Mother. *Id*. at 24. On the other hand, it concluded that the existence of extended family favored Father, along with the factor concerning mental health. *Id*. at 18, 29-30.

Although the court observed that "[t]he instability may be slightly higher in Father's home[,]" it ultimately deemed the factor neutral. *Id*. at 17. The court classified the remaining factors as neutral, including each parent's ability to provide childcare when unavailable. Of note, it credited the parents with shielding C.S. from their personal turmoil and found that, as is typical of his age, C.S. could not form a preference. *Id*. at 19. The court considered Mother's concerns about alcohol use by Father, concluding that he "may not abuse alcohol but he misuses intoxicating beverages." *Id*. at 28. However, it characterized the factor concerning a history of alcohol abuse as neutral. *Id*. at 29.

As the court explained: "Each [p]arty provides more than appropriate nurturing for their son, with Father seemingly more the 'fun parent,' as compared to Mother, who provides [C.S.] with a more disciplined emotional structure having consistency." *Id*. at 21. Indeed, the parties and Dr. Bernstein agreed that C.S. was thriving in the week-to-week schedule where he spent equal time in each parent's custody. *Id*. at 31. However, Dr. Bernstein also acknowledged the difficulty in successfully maintaining this structure with Mother moving two hours away. *Id*. at 32. Thus, despite the

proximity of the residences being deemed a neutral factor, the court found that relocation prohibited equally shared physical custody. *Id*. at 24.

In considering whether relocation was in the best interests of C.S., the court found that moving for Mother's permanent employment would enhance her quality of life. *Id*. at 36. Overall, the court was deeply concerned about the parents' acrimony towards each other and C.S.'s upcoming realization of this divide, but believed both were attentive, caring parents and, for now, had shielded C.S. from their contentious relationship. Notwithstanding its individual concerns as to each parent, and lack of confidence in them to be able to co-parent, it determined that relocation to Altoona and primary custody with Mother during the school year was in C.S.'s best interests. It balanced Father's lessened custody over the school year with "well over one-half of the overnights during the summer months[.]" *Id*. at 35.

As previously stated, this Court "must accept findings of the trial court that are supported by competent evidence of record," and defer to the trial court "with regard to issues of credibility and weight of the evidence[.]" *White*, 296 A.3d at 1213 (cleaned up). Our review of the record confirms the evidentiary support for the court's findings and credibility determinations. It is apparent that the trial court kept C.S.'s best interests at the forefront of its analysis notwithstanding that the trial was often fraught with aspersions lobbied by one party against the other for conduct unrelated to custody or relocation. The court plainly recognized that in an ideal world the parents would live in the same school district and it would be able to award equally

shared primary physical custody. However, that was not the status of the matter *sub judice*.

While the court tasked Mother with continuing to look for employment closer to Butler County, it credited her consistent testimony that she had not willfully absented herself from the area following discovery of the affair, but rather had "expanded [her] search" to areas "geographically located . . . still relatively close to [Valencia], two to three hours away" because "[t]here were very, very few positions in the Pittsburgh area." N.T. Hearing, 6/8/23, at 202; **see also** N.T. Hearing, 11/8/23, at 88 ("I was continuing to look for positions in town, I just expanded my search area knowing that I didn't need to remain in that marital house."); **id**. at 93 ("I expanded the search area. I didn't eliminate searching in Pittsburgh, I just expanded my area."). Based on the living situation and the history of the case, its decision to permit C.S. to relocate to Altoona with Mother and to grant her primary physical custody during the school year based upon its evaluation of the pertinent factors is amply supported by the record. Insofar as Father asks us to reweigh those factors, we will not. He therefore is not entitled to relief as to issues 1(C), (D), (G), (H), (I), (J), 2, 3, 4, 5, and 6.

We turn now to Father's allegation that the trial court prejudged Mother's relocation request. He complains that the court essentially granted relocation by stating that because Mother had already moved, "it would not be for me to tell her she has to come back." N.T. Hearing, 6/7/23, at 114; **see** Father's brief at 63. According to Father, "[t]he trial court easily could

have ruled that relocation is denied and that Mother would have to relocate back to Butler County in order to maintain the status quo of 50/50 custody[.]" Father's brief at 64.

Our review of the record reveals that Father's interpretation of this statement is divorced from the context in which it was made. On the first day of the custody trial, the court observed that Mother had already moved, so it *sua sponte* withdrew Mother's relocation request, without prejudice. **See** N.T. Hearing, 6/7/23, at 4. There was some confusion as to whether the court would consider the relocation factors as to C.S. relocating, but it permitted Father to present supportive evidence regarding relocation. **Id**. at 3-6. Later, the court clarified that it had meant that it was going to discuss § 5337 within the catch-all factor for § 5328 in its opinion instead of outlining them separately.

Upon further consideration, though, the court decided it would provide detailed analysis of § 5337 in its final opinion apart from the custody factors set forth at § 5328. **Id**. at 113-14. In rescinding its withdrawal of Mother's relocation request, the court noted that its consideration of the relocation factors pertained only to C.S. and not to whether Mother herself could move, as she had already done so. **Id**. at 114 (emphasizing that "[t]he child, that's the issue" for relocation). That is an accurate statement of the law. **See** Pa.C.S. § 5322(a) (emphasis added) (defining relocation as "[a] change in a residence of **the child** which significantly impairs the ability of a nonrelocating party to exercise custodial rights" (emphasis added)). Based on the foregoing,

we discern no prejudgment and conclude that Father is not entitled to relief on this claim.

Next, Father asserts that January 5, 2024 order granted relocation and ended his 50/50 custody, but was an unappealable interim order and therefore violated his due process rights. *See* Father's brief at 66. The Rules of Civil Procedure permit interim orders thusly:

> At any time after commencement of the action, the court may on application or its own motion grant appropriate interim or special relief. The relief may include, but is not limited to, the award of temporary legal or physical custody; the issuance of appropriate process directing that a child or a party or person having physical custody of a child be brought before the court; and a direction that a person post security to appear with the child when directed by the court or to comply with any order of the court.

Pa.R.Civ.P. 1915.13. Notably, "Rule 1915.13 contains a broad provision empowering the court to provide special relief where appropriate." *Id*. at Explanatory Comment – 1981.

Here, the trial court indicated that it entered the interim order after hearing the majority of the testimony, namely that from Mother, Father, the expert witness, and multiple additional witnesses on the first four days of the custody trial, which occurred within a span of five months. Based thereon, it found "compelling credible evidence" on those days "to support granting Mother's relocation with [C.S.]" Trial Court Opinion, 3/6/25, at 2. We find no error in this regard. The court considered the delay of these proceedings and the need for stability for C.S. during its pendency, and then made a decision

towards those aims informed by the illuminative testimony from everyone. It only lacked testimony from Ms. Colonello, and the parents' rebuttal thereto.

Father next assails the improper prolongation of the matter, which resulted in C.S. aging three years from the initial custody petition to the final order. **See** Father's brief at 80-81. While he concedes that the matter started promptly, he contends that "it did not timely conclude."[7] **Id**. at 79.

It is clear from the record that the trial court attempted to keep the custody proceedings moving and reminded the parties to avoid mixing the custody matter with unnecessary and improper testimony and evidence regarding the dissolution of the marriage. **See, e.g.**, N.T. Hearing 6/8/23, at 65-66. Moreover, the court tried to schedule the additional hearing days in close succession in accordance with the Pa.R.Civ.P. 1915.4(c), but was stymied by conflicting calendars for counsel and the court. **Id**. at 67-72. At the same time, though, the court held the matter under advisement for seven additional months.

Notwithstanding the court's attempts to conclude the case quickly and schedule the hearings in close succession, we agree that these proceedings took an unacceptable amount of time to resolve. However, we have lamented that, unfortunately, the Supreme Court, in its capacity as the exclusive rule-making authority, provided no basis for relief in Rule 1915.4 for situations,

---

[7] We acknowledge that Father waived compliance with the timing requirements of Rule 1915.4 in permitting a delayed start to the trial. However, we do not interpret Father's affidavit in that regard as a wholesale waiver of compliance with Rule 1915.4 for the entirety of the proceedings.

- 22 -

such as this one, where the trial court has allowed a custody case to improperly linger:

> [E]ven if the trial court's delay was unjustified, Father would not be entitled to relief. Rule 1915.4(d) does not provide a remedy or any other sanction when the trial court does not comply with the time limits. ***See Dear v. Dear***, 3023 EDA 2023, 2024 WL 3791650 at *6 (Pa.Super. 2024) (non-precedential decision) (noting that [Rule] 1915.4(d) does not provide a remedy or sanction for failure to comply); ***see also Heffley v. Heffley***, 977 WDA 2023, 2024 WL 1855126 at *8 (Pa.Super. 2024) (non-precedential decision) (declining to vacate a custody order due to a violation of Pa.R.C.P. 1915.4(d) because it does not provide a remedy).

***Michael v. Michael***, 334 A.3d 384, 2025 WL 210548, at *13 (Pa.Super. 2025) (non-precedential decision) (cleaned up). We agree with our esteemed colleagues' analysis of this issue, and likewise find that it garners Father herein no relief. ***Id***.

In his penultimate issue, Father claims the court erred in denying his request to present rebuttal evidence to Mother's testimony. ***See*** Father's brief at 83. He further assails the court for stating that it was not going to change its ruling and for not permitting Father to present updated testimony as to any changes in circumstances since he last testified months prior. ***Id***. at 83-85.

"A trial court has wide discretion in ruling on the relevancy of evidence and its ruling will not be reversed absent an abuse of discretion." ***K.T. v. L.S.***, 118 A.3d 1136, 1165 (Pa.Super. 2015) (cleaned up). With regard to credibility:

> Rebuttal evidence is proper where it is offered to discredit testimony of an opponent's witness. Our Supreme Court has

> previously opined where the evidence goes to the impeachment of his opponent's witness, it is admissible as a matter of right. Furthermore, in order to constitute proper impeachment evidence, the rebuttal witness'[s] version of the facts must differ from that of the witness being impeached.

***Am. Future Sys., Inc. v. BBB***, 872 A.2d 1202, 1213 (Pa.Super. 2005) (cleaned up).

Once again, we deem it necessary to provide the appropriate context for the court's statement at trial. On the sixth and last day of testimony, Father sought to attack Mother's credibility in a variety of ways during his allotted rebuttal testimony. The court emphasized that it was the judge of credibility, that many issues counsel sought to challenge were irrelevant, and others could have been broached during Mother's initial cross-examination. ***See*** N.T. Hearing, 5/22/24, at 28-30. After much back and forth, the court explained that it was not going to change its ruling sustaining Mother's objection to documentation about how Mother obtained purported text messages between Father and Ms. Colonello because it was irrelevant to custody and relocation. ***Id***. at 30-33. Further, the court reiterated that it was limiting rebuttal to Ms. Colonello's testimony, and would not permit the parties to keep bringing in more information. ***Id***. at 39.

While rebuttal evidence pertaining to Mother's credibility was generally admissible, the court was permitted to limit cumulative testimony or testimony that could have been presented earlier. As the court observed, the sustained objections related to "grain[s] of sand in a dump truck full of sand on the issue of credibility." ***Id***. at 36. Our review of the record bears out that

Father had already challenged Mother's credibility, the court was attempting to move the case towards resolution, and some of the evidence proffered could have been introduced during Mother's cross-examination. Accordingly, we do not find that the court abused its discretion in limiting the parameters of the rebuttal testimony it would entertain on the sixth day of this custody trial. Father is not entitled to relief on this claim.

Finally, Father complains that the court did not award him additional holiday time so that C.S. could occasionally participate in the weekly extended family gatherings. *See* Father's brief at 126-27. He asserts that even if the court were to still grant relocation instead of preserving the prior 50/50 schedule, it could have allowed C.S. to attend these gatherings by granting him custody for long holiday weekends or ordering Mother to pick up C.S. in Butler on Sundays. *Id*.

Father offers no legal analysis in support of this claim. *Id*. We will not make Father's argument for him. *See C.H.L. v. W.D.L.*, 214 A.3d 1272, 1276 (Pa.Super. 2019) ("[F]ailure to develop an argument with citation to, and analysis of, pertinent authority results in waiver of that issue on appeal." (cleaned up)). Therefore, he has waived this issue. Moreover, even if not waived, given our preceding discussion, we discern no error in how the court split holiday time. It is apparent the court took great care to make the schedule as fair as possible for both parents while prioritizing the best interests of C.S., and allowed Father the opportunity to attend his Sunday family

gatherings with C.S. during the summer months on the weekends between his consecutive weeks.

Based on the foregoing, we affirm the trial court's order granting relocation of C.S. to Altoona and setting forth a custody schedule, based thereon, for the school year and the summer.

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 10/20/2025